UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

SUNIL WALIA,                                                    :        **FILED UNDER SEAL**
                                                               :
                        Plaintiff,                             :        ECF Case
                                                               :
            v.                                                 :        06-CV-06587 (JBW) (MDG)
                                                               :
MICHAEL CHERTOFF, Secretary, Department                        :
of Homeland Security, I.C.E.,                                  :
                                                               :
                        Defendant.                             :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND A PROTECTIVE ORDER**


                                    MICHAEL B. MUKASEY
                                    United States Attorney General
                                    Attorney for Defendant Michael Chertoff
                                    United States Attorney's Office
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Telephone No. (212) 637-2785
                                    Facsimile No. (212) 637-2750


JOSEPH A. PANTOJA
Special Attorney to the Attorney General

        – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Organizational Structure of SAC NY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Mobility Requirement for Special Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    Yagoda's Employment at DSAC NYC and DSAC JFK since 1995 . . . . . . . . . . 5

    D.    Consideration of Yagoda for the Position
        of Program Manager, DSAC JFK, in March 2007 . . . . . . . . . . . . . . . . . . . . . 5

    E.    Reorganization of SAC NY on September 20, 2007 . . . . . . . . . . . . . . . . . . . . 8

    F.    Yagoda's Disagreement with Group Supervisor Ahearne in October 2007 . . . . . 8

    G.    Involuntary Reassignments Within SAC NY Prior to January 2008 . . . . . . . . . 10

    H.    Realignment of SAC NY Personnel Effective January 6, 2008 . . . . . . . . . . . . 12

        1.    Supervisory Special Agent Reassignments . . . . . . . . . . . . . . . . . . . . . . 12

        2.    December 4, 2007 Meeting Concerning
            Non-Supervisory Reassignments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.    December 20, 2007 Memoranda Announcing the Realignment . . . . . . . 14

        4.    Selection of Yagoda to Fill the AIRG Vacancy . . . . . . . . . . . . . . . . . . . 15

        5.    Selection of Two Additional Supervisors for Reassignment . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFF'S
    CLAIM FOR PRELIMINARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Walia Lacks Standing to Request
        Preliminary Relief For Speculative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    This Court Lack Jurisdiction, Even in Equity, over Claims
Coming Within the Purview of the CSRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.    Statutory Regime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.    The Allegations Underlying Plaintiff's Motion
Give Rise to Claims Cognizable under the CSRA . . . . . . . . . . . . . . . . . 22

II.    PLAINTIFF HAS NOT MET HIS BURDEN OF PROOF
ON HIS MOTION FOR PRELIMINARY RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.    Governing Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    B.    Plaintiff Cannot Show That Extreme or Very Serious
Damage Will Result in the Absence of Preliminary Relief . . . . . . . . . . . . . . . . . 25

    C.    Plaintiff Cannot Make a Clear Showing
of Entitlement to Preliminary Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1.    Yagoda's Reassignment Does Not Rise to the Level
of an Adverse Action Under Applicable Law . . . . . . . . . . . . . . . . . . . . . 29

        2.    Plaintiff Has Not Shown That Dalessandro Had Actual or Constructive
Knowledge of Yagoda's Deposition Testimony in This Case . . . . . . . . 31

        3.    Plaintiff Cannot Show a Causal Relationship Between Yagoda's
Deposition Testimony in This Case and His Reassignment to AIRG . . . 33

III.    PLAINTIFF'S APPLICATION FOR A PROTECTIVE
ORDER SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

SUNIL WALIA,

                        Plaintiff,

             v.

MICHAEL CHERTOFF, Secretary, Department
of Homeland Security, I.C.E.,

                     Defendant.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

ECF Case

06-CV-06587 (JBW) (MDG)

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND A PROTECTIVE ORDER

Defendant Michael Chertoff, Secretary, Department of Homeland Security ("DHS"), by his attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to plaintiff's application for a protective order and a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiff Sunil Walia ("Walia") alleges that his former supervisor, Steven Yagoda ("Yagoda"), was improperly reassigned from his position as Group Supervisor, General Investigations group, which was located in Queens, New York, to the position of Group Supervisor, Asset Identification and Removal Group ("AIRG"), which is located in Manhattan, as retaliation for Yagoda's having provided deposition testimony in this case. Walia seeks an order requiring DHS to restore Yagoda to his former position in Queens, contending that Yagoda's reassignment might intimidate unidentified potential witnesses and adversely affect their testimony. Walia also seeks a protective order enjoining DHS from retaliating or intimidating unidentified potential witnesses.

Walia's application for preliminary relief should be denied for several reasons.  Walia lacks standing on account of the speculative nature of the claim underlying the motion for preliminary relief.  *See* Section I.A, *infra*.  Moreover, even if the claim concerning Yagoda's reassignment had been properly pled, such a claim would come within the purview of the Civil Service Reform Act ("CSRA"), *see* 5 U.S.C. § 2301 *et seq*., which provides the exclusive remedy, thereby precluding judicial review, except to the extent provided for in the statute itself.  Because Walia has not established that he exhausted his remedies under the CSRA with respect to the claim underlying his request for preliminary relief, or that judicial review is authorized under the CSRA, this Court is without jurisdiction to consider it.  *See* Section I.B, *infra*.

Even assuming *arguendo* that this Court has jurisdiction over Walia's motion for preliminary relief, he has not met the heightened standards applicable to both a request for a mandatory injunction and an injunction in government personnel matters.  Specifically, Walia cannot show that extreme or very serious damage will result to his ability to present his case in the absence of preliminary relief returning Yagoda to his former position.  *See* Section II.B, *infra*.  Walia has not identified any witnesses who allegedly have been intimidated.  Walia does not allege that he exhausted the discovery process to evaluate any such witness's testimony or even explain why such testimony is essential to his case.  Walia's conclusory assertion, relying on hearsay, that potential witnesses' testimony might somehow be chilled unless Yagoda is returned to his former position is rank speculation that finds no support in the record.

Nor can Walia make a clear showing that he is entitled to the relief requested.  *See* Section II.C, *infra*.  Under the applicable law in the context of government personnel decisions reviewed under the CSRA, geographic reassignments generally are not considered "adverse actions" for purposes of the CSRA where the employee's pay and grade remain unchanged.  In any event, Walia has not shown any adverse change in the terms and conditions of Yagoda's employment or otherwise rebutted the Government's legitimate, non-retaliatory reasons for

2

selecting Yagoda to fill the AIRG vacancy.  Accordingly, Walia's motion for preliminary relief should be denied.

Finally, Walia's motion for a protective order, which purportedly seeks to enjoin DHS from intimidating or retaliating against unidentified potential witnesses, should be denied for the same reasons as Walia's motion for mandatory preliminary relief, and because the vague remedies requested are not suitable for preliminary relief.  *See* Section III, *infra*.

<u>**STATEMENT OF THE CASE**</u>

**A.    Organizational Structure of SAC NY**

The office of the Special Agent in Charge, New York ("SAC NY") is the highest graded, non-headquarters managerial position in DHS.  Declaration of Salvatore ("Dalessandro Decl.") ¶ 2.  It consists of two offices headed by a Deputy Special Agent in Charge ("DSAC"). Dalessandro Decl. ¶ 3.  The DSAC for New York City ("DSAC NYC") is located in Manhattan, and the DSAC for JFK International Airport ("DSAC JFK") is located at the Airport in Queens, New York.  Dalessandro Decl. ¶ 3; Declaration of Mona Forman ("Forman Decl.") ¶ 2; Declaration of Peter T. Edge ("Edge Decl.") ¶ 2.  DSAC NYC oversees six Assistant Special Agents in Charge ("ASACs"), which comprise the following five divisions or units:  National Security Division; Narcotics/Public Safety; Alien Smuggling/Frauds/Human Trafficking; Organized Crime Drug Enforcement Strike Force ("OCDESF"); and the Financial Division/El Dorado Anti-Money Laundering Task Force, which has two ASACs.  Dalessandro Decl. ¶ 4.

The SAC NY has authority to fill vacancies in DSAC NYC by lateral transfers, involuntary or otherwise, of Special Agents from DSAC JFK to DSAC NYC and vice-versa. Dalessandro Decl. ¶ 6.  Such authority would be used, for example, when human resources need to be assigned in a more expeditious manner than the competitive merit promotion process would allow.  *Id.*  A position that becomes vacant through retirement may also be filled through lateral, involuntary transfers.  *Id.*  Reassignment of personnel is also conducted for professional

development, as well as based on the employee's proficiency and familiarity with the various

program areas and laws enforced by ICE.  *Id.*

**B.      Mobility Requirement for Special Agents**

All agents, including supervisors, are subject to transfers or changes in their assignments

based on the needs of the agency at the direction of the office head or his or her designee.  Edge

Decl. ¶ 14; Forman Decl. ¶ 14.  DSAC NYC and DSAC JFK are both part of the New York City

operations overseen by SAC NY, and all Special Agents, including supervisory Special Agents,

assigned to SAC NY must live within the commuting area of its offices, including DSAC NYC

and DSAC JFK.  Dalessandro Decl. ¶ 23.  Accordingly, there is no restriction on the

reassignment of Special Agents, including supervisory Special Agents, from DSAC NYC to

DSAC JFK or vice-versa based on the effect of the reassignment on the agent's commute to

work, except that the reassigned employee might be entitled to reimbursement of certain

relocation-related expenses if the commute exceeds 50 miles one way.  *Id.*  Many of the agents

assigned to DSAC NYC do not reside in Manhattan.  *Id.*

When applying for the CI (Criminal Investigator) FCIP (Federal Career Intern Position),

which is how Special Agents come to join DHS, ICE today, applicants are asked the following

question concerning the amount of mobility that is inherent in the position:

> Mobility is a major factor in this occupation.  Applicants must be
> willing to accept employment at any location offered.  A tour of
> duty at the first duty station will be a minium of 3 years.
> Additionally, Special Agents are regularly reassigned to new
> locations for the good of the service with little advance notice. Are
> you willing to comply with these requirements?

Monteagudo Decl. ¶ 6; Id. Ex. 3.  Failure to accept these working conditions will remove an

applicant from consideration for Special Agent positions.  *Id.* ¶ 6.

All Special Agents, including supervisory Special Agents such as Yagoda, receive Law

Enforcement Availability Pay ("LEAP"), which amounts to an additional twenty-five percent

over a Special Agent's salary, as compensation for any time spent by a Special Agent beyond the

forty-hour work week, including the time spent commuting to and from the agent's assigned post

of duty.  Dalessandro Decl. ¶ 24.  Each Special Agent, including supervisory Special Agents, are

also issued government vehicles equipped with EZ passes, which the agents use to commute to

work.  *Id.*  All gas and EZ pass charges incurred during authorized use of government vehicles,

including the commute to and from work, are paid for by the government.  *Id.*

**C.     Yagoda's Employment at DSAC NYC and DSAC JFK since 1995**

Yagoda worked in the AIRG in Manhattan as a Grade 13 Special Agent from 1995 to the

end of 2001, when he was assigned to the El Dorado Task Force to work on a large operation

investigating terrorist finance issues.  *Id.* ¶ 19; Declaration of Drew Houlihan ("Houlihan Decl.")

¶ 8.  In 2003, Yagoda became the Group Supervisor of the General Investigations group, DSAC

JFK, a position he held until January 5, 2008.  Edge Decl. ¶ 3.  Yagoda's General Investigations

group at JFK had "three major components," one of which was "an administrative component,

which is an admin function within the office responsible for property issues, physical security,

the issuance of property, tacking of property, the inventory of property, the maintenance of

certain databases, the maintenance or our continuation of operation plan . . . ."  Pantoja Decl.

Ex. 1 (Yagoda deposition) at 9-10.  The administrative component of Yagoda's General

Investigations group was large enough to require the permanent assignment of two Special

Agents to handle administrative duties within the group.  Pantoja Decl. Ex. 2 (Walia deposition)

at 103, 109.  Since January 2008, Yagoda has been the Group Supervisor for the Asset

Identification and Removal Group, Financial Division 4, DSAC NYC.  Edge Decl. ¶ 3.

**D.     Consideration of Yagoda for the Position**
**         of Program Manager, DSAC JFK, in March 2007**

From January 9, 2005, until January 17, 2007, Edge served as an Assistant Special Agent

in Charge ("ASAC") for the Financial Division in Manhattan, a Grade 15 position.  Edge Decl.

¶ 4.  On January 18, 2007, Edge was involuntarily detailed by DHS, Immigration and Customs Enforcement ("ICE") headquarters from DSAC NYC to the position of Acting DSAC JFK, which is in Queens.  *Id.* ¶ 5.  Edge  remained in that position until April 3, 2007, when he was again involuntarily detailed by SAC NY to the position of ASAC, Alien Smuggling, Frauds, Human Trafficking and Gangs Division, DSAC NYC.  *Id.*  Edge's pay grade did not change as a result of these reassignments.  *Id.*  While Edge was Acting DSAC JFK, he was Yagoda's second line supervisor.  *Id.* ¶ 6.  As such, Edge had the authority to reassign Yagoda within DSAC JFK based on the needs of the agency.  *Id.* ¶ 7.

In or about early 2007, Kevin Dellicolli ("Dellicolli"), the Acting SAC at the time, came to the JFK office to meet with the staff.  Edge Decl. ¶ 8.  At that meeting, Dellicolli explained that he wanted to strengthen administrative operations and that he was essentially following through with the initiative of Martin Ficke, the recently retired SAC New York.  *Id.*  During the meeting, Dellicolli informed Edge that Mr. Ficke had identified Yagoda as a good candidate for the Program Manager position, and that Dellicolli agreed with that assessment.  *Id.*  Dellicolli asked Edge to inquire whether Yagoda would be interested in the position of Program Manager, which would entail managing the support staff and some senior Special Agents, and reporting directly to the DSAC JFK.  *Id.*

Edge agreed with Dellicolli that Yagoda was a good choice for the Program Manager position.  Edge Decl. ¶ 9.  In his position as Group Supervisor, General Investigations group, DSAC JFK, Yagoda amassed administrative experience.  *Id.*  Yagoda's General Investigations group, unlike other groups at DSAC JFK, was and continues to be responsible for numerous administrative duties for all of DSAC JFK, in addition to the general investigatory work of the group.  *Id.*  Because of his background, Yagoda was a good choice for the Program Manager position, and Edge was optimistic that Yagoda would be willing to accept that position.  *Id.*

6

In or about March 2007, Edge and Marc Lorenti, then the ASAC of the General Investigations Division, DSAC JFK, met with Yagoda in connection with the vacant Program Manager position. Edge Decl. ¶ 10. At that meeting, Edge asked Yagoda if he would be willing to accept the responsibility of serving as a Program Manager. *Id.* Yagoda stated that he would consider any transfer as retaliation for his complaints against DHS and that he did not want to go to DSAC NYC. *Id.* Edge was surprised and confused by Yagoda's response since no one at the meeting had told Yagoda that he was being transferred or reassigned to DSAC NYC. *Id.* Edge then explained to Yagoda that the Program Manager position, if he wanted it, would be at DSAC JFK, after which Yagoda stated that he would consider it. *Id.*

Ultimately, the office abandoned its efforts to fill the Program Manager position and did not pursue the matter any further with Yagoda or anyone else. Edge Decl. ¶ 11. Edge gave Yagoda the courtesy of asking him if he would be interested in accepting a new responsibility in the office, but Edge did not authorize or otherwise arrange for any personnel action involving Yagoda in connection with the Program Manager opportunity. *Id.* ¶ 12. Yagoda was never reassigned to the position of Program Manager nor did he otherwise assume the duties of that position. *Id.*; Monteagudo Decl. ¶ 3. Accordingly, there was nothing that needed to be rescinded or undone with respect to Yagoda on account of merely offering him the position of Program Manager. Edge Decl. ¶ 12.

From time to time, Edge has asked other employees under his supervision if they would be willing to accept additional responsibilities in the office. Edge Decl. ¶ 15. Edge would expect to handle similar situations in the future with the same consideration and fairness extended to Yagoda. *Id.* Prior to Edge approaching Yagoda and discussing the Program Manager opportunity with him, Edge was not aware that Yagoda had engaged in prior EEO activity or provided testimony concerning any matter to Internal Affairs or an investigator with the Office of Professional Responsibility. Edge Decl. ¶ 13.

**E.      Reorganization of SAC NY on September 30, 2007**

On September 30, 2007, SAC NY was reorganized.  Monteagudo Decl. ¶ 4.  Because the

reorganization affected the organizational structure of the entire office, Yagoda, like all SAC NY

employees, received a Standard Form 50 ("SF-50") reflecting that event.  *See id.* at Ex. 1 (blocks

5B and 5D).  As reflected in block 22 of the SF-50, the effect of the reorganization was that the

entire SAC NY now reported to an Assistant Director of Operations for the East Coast.  *Id.* ¶ 4

and Ex. 1.  Yagoda was not transferred as a result of the reorganization.  *Id.*  The code that

appears in block 22 (HS BB 1503090002000000) identifies Yagoda's duty station as the JFK

office, the same location to which he was assigned prior to the reorganization.  *Id.*  If Yagoda had

been reassigned to the Manhattan office, the ninth and tenth digits of the code would have been

"00" instead of "02."  *Id.*

**F.      Yagoda's Disagreement with Group Supervisor Ahearne in October 2007**

Prior to April 2007, Mona Forman ("Forman") was an Assistant Special Agent in Charge

("ASAC") for the Alien Smuggling, Frauds, Human Trafficking and Gangs Division, a Grade 15

position in SAC NY.  Forman Decl. ¶ 3.  Her office was located at 601 West 26th Street in

Manhattan.  *Id.*  In April 2007, she  was involuntarily detailed to her current position, Acting

Deputy Special Agent in Charge, JFK International Airport office ("Acting DSAC JFK"), where

she has remained ever since.  *Id.* ¶¶ 1, 3.  As Acting DSAC JFK, Forman is the highest ranking

management official with direct oversight of the JFK office.  *Id.* ¶ 6.  Forman was Yagoda's

second-line supervisor from April 2007 until January 2008 while he was the Group Supervisor,

General Investigations group, at JFK.  *Id.* ¶ 4; Dalessandro Decl. Ex. 1 (organization chart).  As

DSAC JFK, Forman has the authority to address any conduct that could negatively affect the

professional and efficient running of the JFK office.  Forman Decl. ¶ 6.  Prior to Forman's arrival

at JFK in April 2007, she did not know whether Yagoda had ever commenced an EEO

proceeding.  *Id.* ¶ 5.  Sometime after joining the JFK office, Forman learned that Yagoda had

initiated an EEO proceeding in which he complained about her handling of an incident between Yagoda and another Group Supervisor in October 2007. *Id.* ¶ 5.

In October 2007, Forman became aware of a disagreement between Patrick Ahearne, Group Supervisor, Narcotics 1, DSAC JFK, and Yagoda in connection with the work performed by Special Agents in Yagoda's group while they were assisting in one of Ahearne's operations. Forman Decl. ¶ 7. Apparently, Ahearne sent Yagoda an e-mail that was critical of the work of Yagoda's group, to which Yagoda took offense. *Id.* Yagoda then forwarded Ahearne's e-mail, which had not been addressed nor copied to any non-supervisory employees, to the Special Agents in Yagoda's group who had participated in the operation in question. *Id.* Yagoda's dissemination of the e-mail caused a disruption in the workplace. *Id.*

After reviewing Ahearne's e-mail, Forman determined that it was inappropriate and that Ahearne should have addressed any concerns about the performance of Yagoda's agents through the appropriate chain of command. Forman Decl. ¶ 8. Ahearne was counseled regarding his e-mail, and he received a counseling memorandum. *Id.* Forman also found fault with how Yagoda had handled the matter. *Id.* ¶ 9. Forman concluded that Yagoda had exhibited very poor judgment and a lack of discretion in forwarding Ahearne's e-mail to Special Agents in Yagoda's group, especially since Yagoda himself was of the view that the e-mail's content was objectionable or otherwise inappropriate. *Id.* As explained by Forman, Yagoda should have addressed any concerns he had about Ahearne or his e-mail through the appropriate chain of command. *Id.* In addition, Yagoda should have foreseen, or at least anticipated in light of his own feelings about the e-mail, that any further dissemination of Ahearne's e-mail would cause a disruption in the workplace. *Id.* Forman found fault with Yagoda's failure to instruct or otherwise ask his agents, at a minimum, to refrain from further dissemination of Ahearne's e-mail. *Id.*

As a result of the incident, Yagoda was counseled regarding the dissemination of Ahearne's e-mail and received a counseling memorandum.  Forman Decl. ¶ 9 and Ex. 1.  There was no disciplinary action taken against Ahearne or Yagoda in connection with the October 2007 incident because, in Forman's view, the counseling and the counseling memoranda – as opposed to formal disciplinary action – were a sufficient and appropriate means of handling the situation. *Id.* ¶ 10.  Forman keeps a copy of the counseling memoranda in her local file.  *Id.* However, because counseling memoranda do not rise to the level of a reprimand, they are not part of either Ahearne's or Yagoda's official personnel file.  *Id.*; Declaration of Douglas Hooper ("Hooper Decl.")  ¶¶ 3-4.

At the time of the issuance of the counseling memorandum to Yagoda, Forman did not know that he had provided testimony in Walia's EEO or district court cases or Kevin Smith's EEO case, or that Yagoda had provided a statement to an EEO investigator in connection with any matter.   Forman Decl. ¶ 11.

## G.    Involuntary Reassignments Within SAC NY Prior to January 2008

The creation of DHS and Customs and Border Protection ("CBP") in March 2003 constituted the largest reorganization in the history of the federal government and affected more than 180,000 employees, many of whom were involuntarily transferred from the former Immigration and Naturalization Service and United States Customs to newly created positions in DHS and ICE, among other components.  Dalessandro Decl. ¶ 17.  The legacy immigrations and customs programs consist of operations that pre-existed the 2003 reorganization and continued in some form or another in DHS and CBP, among other components.  *Id.*  Since 2003, reassignments have been a common occurrence at SAC NY.  Monteagudo Decl. ¶ 5 and Ex. 2 (memoranda reflecting SAC NY reassignments).  Except in the case of newly promoted agents, reassignments are typically involuntary and after little or no notice.  Dalessandro Decl. ¶ 5; Ficke Decl. ¶ 13.

10

Over the past year, two high-level managers were reassigned between DSAC NYC and DSAC JFK.  As a Grade 15 Special Agent, ASAC Edge was twice reassigned involuntarily during 2007, from DSAC NYC to DSAC JFK and then back again within several months.  Edge Decl. ¶ 14.  Edge's commute to work was approximately 40 miles to the Manhattan office and 76 miles to the JFK office, and therefore the JFK assignment necessarily resulted in a substantial increase in his daily commute to work.  Edge Decl. ¶ 5.  Similarly, DSAC Forman, while a Grade 15, was involuntarily detailed from the Manhattan office to the JFK office in April 2007, and to date she has not resumed her former ASAC duties in Manhattan.  Forman Decl. ¶ 14.

In or about 1999, Drew Houlihan ("Houlihan") was involuntarily reassigned from AIRG to the El Dorado Task Force ("EDTF"), Group IV, which deals with money remitters.  Houlihan Decl. ¶ 5.  In or about October 2001, Houlihan again was involuntarily assigned to another EDTF unit to work on a large operation investigating terrorist finance issues.  *Id.* ¶ 8.  In approximately October 2001, John Kane ("Kane"), as a Group Supervisor, was involuntarily reassigned from AIRG to the Narcotics Division.  Kane Decl. ¶ 3.  In or about Spring 2003, Kane again was involuntarily reassigned to his current position of Supervisor, Financial Unit, DSAC NYC.  *Id.* ¶ 4.  At the time of the reassignment, Kane asked upper management to keep him in his position in the Narcotics Division, but that request was denied.  *Id.*

Effective June 26, 2005, Joseph Love, a Group Supervisor at the time, was reassigned as part of a realignment.  Dalessandro Decl. ¶ 34 and Ex. 7.  Effective September 11, 2005, Mark Witzal, a Group Supervisor at the time, was reassigned as part of another realignment.  *Id.* ¶ 35 and Ex. 8.  Group Supervisors John Kane, Vincent Luongo, and Tom Caso were also reassigned as part of a realignment effective March 23, 2003.  *Id.* ¶ 36 and Ex. 9.  There are numerous additional examples of Group Supervisors who have been involuntarily reassigned as part of a realignment or otherwise in the last five years, including supervisory Special Agents Dominick Lopez, Scherry Douglas, Laura Heydweiller, Jody Foresta, and Steven DeMayo, who were

11

involuntary reassigned to, from, or within DSAC NYC. Dalessandro Decl. ¶ 37; Ficke Decl. ¶¶ 4-13 and Ex. 1.

**H.     Realignment of SAC NY Personnel Effective January 6, 2008**

**1.     Supervisory Special Agent Reassignments**

In approximately October or November 2007, Acting SAC Dalessandro learned that Diane Hansen, then Group Supervisor, Financial Division 2, DSAC NYC, and Joseph Macchiaroli, then Group Supervisor, AIRG, Financial Division 4, DSAC NYC, would be retiring at the end of 2007. Dalessandro Decl. ¶ 7 and Ex. 1 (SAC NY organization chart). At the end of November 2007, in anticipation of next month's meeting among the SAC, DSACs and ASACs, Acting SAC Dalessandro's assessment was that Yagoda, at the time Group Supervisor, General Investigations Group, DSAC JFK, would be the best candidate to fill the position vacated by Mr. Macchiaroli, and that Laura Heydweiller, Group Supervisor, Financial 5, DSAC NYC, would be the best candidate to fill the position vacated by Ms. Hansen. Dalessandro Decl. ¶ 8. At that time, Dalessandro also decided on a third supervisory reassignment, Shawn Polonet, and Dalessandro planned to include all three supervisory reassignments in the next realignment of SAC NY's human resources. *Id.*[1]

**2.     December 4, 2007 Meeting Concerning Non-supervisory Reassignments**

On December 4, 2007, there was a confidential meeting among Acting SAC Dalessandro, Acting DSAC NYC, Acting DSAC JFK Forman, and the ASACs of SAC NY, including ASAC Edge, in which Dalessandro directed the ASACs to identify non-supervisory personnel for rotation between DSAC NYC and DSAC JFK. Dalessandro Decl. ¶ 9; Edge Decl. ¶ 16; Forman Decl. ¶ 12. At that meeting, the participants took care to consider only suitable candidates for reassignment. Forman Decl. ¶ 12; Edge Decl. ¶ 16. During the meeting, Dalessandro might have

---

[1]  As anticipated, Mr. Macchiaroli retired effective January 3, 2008. Dalessandro ¶ 7 and Ex. 2.

shared his view that Yagoda and Heydweiller should fill the supervisory positions that were vacated through retirement, but he had already decided on those transfers prior to the meeting. Dalessandro Decl. ¶ 9.  No one at the meeting proposed that Yagoda be reassigned in order to force him to retire.  *Id.*; Forman Decl. ¶ 12; Edge Decl. ¶ 16.  In any event, as the Acting SAC at the time, the decision regarding which employees would be involved in a realignment was solely Dalessandro's, and his selection of Yagoda, which predated the meeting, was based solely on Dalessandro's assessment of his suitability for the AIRG vacancy.  Dalessandro Decl. ¶ 9.

Everyone who attended the December 4, 2007 meeting was reminded that discussions during the meeting were to be kept in the strictest of confidence in light of the focus on as-of-yet undisclosed personnel decisions and the need for management to speak freely when opining on personnel issues.  Dalessandro Decl. ¶ 12; Forman Decl. ¶ 12; Edge Decl. ¶ 16.  Following the meeting, someone leaked information about the personnel movements that had been discussed and, prior to the issuance of a formal memorandum announcing the realignment, Yagoda learned that he would be reassigned to AIRG.  Dalessandro Decl. ¶ 13; Forman Decl. ¶ 13.  On December 5, 2007, Yagoda wrote an e-mail to his immediate supervisor, Marc Lorenti, who forwarded the e-mail to Forman, the Acting DSAC JFK at the time.  Dalessandro Decl. ¶ 13; Forman Decl. ¶ 13.  Forman forwarded  Yagoda's e-mail to Dalessandro, expressing her frustration that the confidentiality of the December 4th meeting had been compromised. Dalessandro Decl. ¶ 13; Forman Decl. ¶ 13.  In his e-mail, Yagoda advised that he had heard a rumor that he was going to be reassigned, that he would consider any reassignment a prohibited personnel practice under "5 USC 2302," that he hoped the rumor was false, and that he wanted further insight from management on the matter.  Dalessandro Decl. ¶ 13 and Ex. 3.

### 3.     December 20, 2007 Memorandum Announcing the Realignment

It was a couple of weeks before Dalessandro issued a memorandum to the Acting DSACs formally announcing the realignment or addressing Yagoda's December 5th e-mail because he was still coping with the breach of the confidentiality of the December 4th meeting.  Dalessandro Decl. ¶ 14.  By memorandum dated December 20, 2007, Dalessandro informed the Acting DSAC NYC and the Acting DSAC JFK of the reassignments.  *Id.* ¶ 14 and Ex. 4.  By memorandum of the same date, Dalessandro responded to Yagoda's December 5th request for an explanation concerning his reassignment.  *Id.* ¶ 14 and Ex. 5.  Dalessandro did not provide a written explanation to other agents involved in the realignment because Yagoda was the only agent who had requested an explanation for his reassignment and whose request had been forwarded to Dalessandro.  *Id.* ¶ 15.

Yagoda's and Heydweiller's supervisory reassignments were part of twenty-five involuntary transfers made by Dalessandro as Acting SAC that became effective January 6, 2008.  Dalessandro Decl. ¶ 10 and Ex. 4.  Of the twenty-five employees who were reassigned effective January 6, 2008, three were Group Supervisors, twenty-one were Special Agents, and one was an Investigative Assistant.  *Id.* ¶ 11 and Ex. 4.  The realignment included seven transfers of employees between DSAC JFK and DSAC NYC.  *Id.* ¶ 16 and Ex. 4.  Specifically, three Special Agents and one supervisory Special Agent (Yagoda) were reassigned from DSAC JFK to DSAC NYC, and three Special Agents were reassigned from DSAC NYC to DSAC JFK.  *Id.*  The January 6, 2008 realignment was not the first time that Special Agents, including supervisory Special Agents, were involved in involuntary reassignments or details between DSAC NYC and DSAC JFK.  Dalessandro Decl. ¶ 33 and Ex. 7; Ficke Decl. ¶¶ 3-14 and Ex. 1; Edge Decl. ¶ 14; Forman Decl. ¶ 14; Monteagudo Decl. ¶¶ 5-6 and Exs. 2, 3.

14

4.     **Selection of Yagoda to Fill the AIRG Vacancy**

Dalessandro's decision to reassign Yagoda was based on conversations with managers from the legacy customs program and his own knowledge of Yagoda's background.  Dalessandro Decl. ¶ 18.  Although Dalessandro was not required to do so, he informed SAC Smith of his intention to reassign Yagoda, and SAC Smith supported that choice and encouraged Dalessandro to go forward with it.  *Id.*  Yagoda's experience and expertise in asset forfeiture made him an ideal candidate for the AIRG position.  *Id.* ¶ 19.  As indicated in the Treasury Enforcement Communications System ("TECS") printout by "Record IDs" beginning with "UN02," from 1995 through October 2001 while Yagoda was in AIRG, he conducted numerous asset recovery operations of the kind conducted by AIRG today.  Dalessandro Decl. ¶ 19 and Ex. 6.

Since leaving AIRG, Yagoda has expressed continued interest in doing asset identification and recovery work by requesting authorization from the agency to do outside employment in that area.  Dalessandro Decl. ¶ 20; Plaintiff's Aff. Ex. 1 at ¶ 19 (Yagoda affidavit) (acknowledging that he "submitted a request for outside employment three years ago.").  Sometime after May 2004 when Delassandro was Acting SAC NY, he reviewed and approved a request by Yagoda for authorization to engage in outside employment involving asset forfeiture.  Dalessandro Decl. ¶ 20.  In addition, at some point after Dalessandro became head of the EDTF in August 2003, Yagoda asked him if he would hire Yagoda as a contractor with the EDTF, a financial program/task force created in 1992 to address money laundering financial crimes in the New York/New Jersey metropolitan areas.  *Id.*  Yagoda is the only supervisory Special Agent in SAC NY who Dalessandro knows to have requested authorization from the agency to engage in outside employment involving work of the kind conducted by AIRG or to do such work as a contractor for EDTF.  *Id.*

Dalessandro does not know where Yagoda resides, but he always assumed that he resides in Queens or Long Island.  Dalessandro Decl. ¶ 23.  In selecting the employees who were going

to be part of the realignment, Dalessandro did not consider or otherwise investigate whether the reassignment would result in a longer commute for any of the employees that were affected by the realignment, as there was no restriction on reassignments based on anticipated effects on the employee's commute.  *Id.*; Ficke Decl. ¶ 14.

As Group Supervisor, AIRG, Yagoda is responsible for providing support to all of SAC NY, including DSAC JFK, on asset forfeiture issues.  Dalessandro Decl. ¶ 25.  The position involves working mostly with civil, as opposed to criminal, investigations and includes an administrative component, and thus it is similar in important respects to Yagoda's former supervisory position in the General Investigations group.  *Id.*  Identification and recovery of assets is integral to the success of the financial operations of the office and is often the only way to dismantle or impair criminal organizations and their money laundering schemes.  *Id.*

When Dalessandro selected Yagoda to replace the retired Supervisor of AIRG, he was aware that John Kane ("Kane"), Group Supervisor of the Financial Unit, DSAC NY, had spent some time supervising AIRG.  Dalessandro Decl. ¶ 26.  However, Kane was not an ideal candidate for the AIRG vacancy because he had been running a national Bulk Cash Smuggling initiative/operation for some time, and Dalessandro did not want to disrupt that operation by moving Kane when Yagoda was available.  *Id.*; Declaration of John Kane ("Kane Decl.") ¶ 6.  In any event, Kane only spent two months in AIRG, and therefore he had considerably less AIRG experience or expertise than Yagoda.  *Id.*; Kane Decl. ¶ 3.  Indeed, while Yagoda worked for Kane as one of the Senior Grade 13 Special Agents in AIRG, Yagoda and another agent, Robert Castioni, provided much instruction to Kane during his short tenure as supervisor of AIRG because Yagoda and Castioni were the subject matter experts.  Kane Decl. ¶ 3.  Other than his brief assignment in AIRG, Kane has spent his career with U.S. Customs/ICE working on criminal matters.  *Id.* ¶ 5.

16

Jody Foresta ("Foresta") is Group Supervisor, Narcotics, DSAC NYC, and her background is mainly in narcotics and money laundering.  Dalessandro Decl. ¶ 28.  Foresta spent a year and a half as Group Supervisor for AIRG from October 2001 to March 2003, but Dalessandro was not aware of that prior to selecting Yagoda.  *Id.*  In any event, that information would not have changed Dalessandro's selection.  *Id.*  Foresta had not worked in AIRG prior to her supervisory appointment to that group, and thus she only had 1.5 years of AIRG experience. *Id.*  Yagoda, by contrast, spent several more years in AIRG as a senior Grade 13 Special Agent and developed more expertise in that group's work.  *Id.*  Consequently, Dalessandro did not even consider Foresta for the AIRG vacancy, especially since he was already aware of Yagoda's suitable background and availability.  *Id.*

Drew Houlihan ("Houlihan") is Group Supervisor, Arms and Strategic Technology Investigation Group, DSAC NYC.  Dalessandro Decl. ¶ 29.  Dalessandro considered Houlihan in connection with the AIRG vacancy, but only briefly.  *Id.*  Houlihan worked in AIRG, but it was for a shorter period than Yagoda.  *Id.*; Declaration of Drew Houlihan ("Houlihan Decl.") ¶ 3.  In addition, Houlihan was the in-house expert on strategic arms investigations at the time, and no other supervisory Special Agent had developed that type of expertise to back fill his spot had Houlihan been reassigned.  Dalessandro Decl. ¶ 29; Houlihan Decl. ¶¶ 1, 9.  Furthermore, Houlihan's group was running an undercover operation, which also made him an unsuitable candidate for the AIRG position at the time.  Dalessandro Decl. ¶ 29; Houlihan Decl. ¶ 9.

By contrast, in DSAC JFK, Yagoda supervised the "General Investigations" group, a position which did not require any particular expertise, and he was not heading or otherwise participating in an undercover operation at the time that Dalessandro considered him for the AIRG vacancy.  Dalessandro Decl. ¶ 30.  Consequently, reassigning Yagoda did not entail the concerns and logistical difficulties that Dalessandro anticipated would result from reassigning Kane or Houlihan.  *Id.*

Dalessandro did not consider Maria Imburgia ("Imburgia"), Group Supervisor, Narcotic 3, DSAC JFK, for the AIRG vacancy because her background and experience had been solely in narcotics, and Dalessandro is not aware of Imburgia having ever expressed an interest in the type of work conducted by AIRG.  Dalessandro Decl. ¶ 31.

Prior to selecting Yagoda to fill the AIRG vacancy, Dalessandro did not know whether Yagoda had provided testimony in any EEO case or whether he had provided testimony in the instant suit.  Dalessandro Decl. ¶ 32.  Dalessandro selected Yagoda for the AIRG vacancy because Dalessandro believed Yagoda was the best candidate for the job, and Dalessandro is currently receiving positive feedback regarding Yagoda's performance of the duties of that position.  *Id.*

### 5.   Selection of Two Additional Supervisors for Reassignment

Dalessandro reassigned Heydweiller to Group Supervisor, Financial Division 2, DSAC NY, because Financial Division 2 was involved in an undercover operation that targeted money laundering through money remitters, and Heydweiller had previously supervised an undercover operation.  Dalessandro Decl. ¶ 21.  In addition, there were certain workplace issues in Financial Division 2 at the time that Dalessandro thought Heydweiller would be good at handling.  *Id.* Heydweiller resides in or near Long Beach, New York.  *Id.*

The third supervisor involved in the involuntary realignment effective January 6, 2008, was Shawn Polonet ("Polonet"), a supervisory Special Agent in the office of SAC NY who was reassigned from SAC NY Program Manager to Group Supervisor within the EDTF division.  Dalessandro Decl. ¶ 22.  Polonet had previously served as headquarters Program Manager with oversight of a nationwide Cornerstone Financial and Outreach Program and was best suited to oversee the local SAC NY Cornerstone group.  *Id.*  Polonet resides in Ridgewood, New Jersey.  *Id.*

## ARGUMENT

## I.

## THIS COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIM FOR PRELIMINARY INJUNCTIVE RELIEF

**A.     Walia Lacks Standing to Request Preliminary Relief for Speculative Claims**

In order to establish standing, "[f]irst, the plaintiff must have suffered an injury in fact –

an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b)

actual or imminent, not conjectural or hypothetical, . . . Second, there must be a causal

connection between the injury and the conduct complained of . . . .  Third, it must be likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (internal quotations and citations omitted);

*Schroedel v. New York Univ. Medical Ctr.*, 885 F. Supp. 594, 598 (S.D.N.Y. 1995) (finding

plaintiff lacked standing to seek injunctive relief where she "failed to allege anything more than

conjecture that the conduct complained of will injure her in the future").  As discussed more fully

in Section II, *infra*, Walia has not identified any potential witness who has been intimidated nor

shown that preliminary relief would even cure the irreparable harm it is supposed to address.  For

the reasons discussed in Section II, *infra*, in connection with the merits of Walia's claim for

preliminary relief, Walia's motion for preliminary relief should be denied for lack of standing

due to its speculative nature.

**B.     This Court Lacks Jurisdiction, Even in Equity, Over Claims Coming Within the Purview of the CSRA**

If Walia had commenced an action with respect to the claim for which he seeks

preliminary injunctive relief – which he has not – this Court would still lack an independent basis

of subject matter jurisdiction over that claim.  *See Stewart*, 762 F.2d at 199 ("Although the filing

19

of a complaint will not necessarily satisfy other jurisdictional requirement [for preliminary injunctive relief], it is certainly a necessary condition.").

### 1.    Statutory Regime

Both Walia and Yagoda are federal employees subject to the provisions of the Civil Service Reform Act, Pub.L. No. 95-454, 92 Stat.1111, as amended (codified at various sections of Title 5 of the United States Code) ("CSRA").  A principal purpose of the CSRA is to "provide increased protection for 'whistleblowers,' federal employees seeking to disclose wrongdoing in the government."  *Frazier v. Merit Systems Protection Bd.*, 672 F.2d 150, 152 (D.C. Cir. 1982); *accord Wren v. Merit Systems Protection Bd.*, 681 F.2d 867, 872 (D.C.Cir. 1982) (noting the "primary purpose" of the CSRA is to "safeguard employees . . . who 'blow the whistle' on illegal or improper agency conduct").  Walia, as an employee of the federal government, has a right to file a complaint under the CSRA with the Office of Special Counsel.  *See* 5 U.S.C. § 1214(a)(1)(A) (2000).  In the case of "adverse action" against a government employee, the CSRA "provides formal proceedings before the agency, and appeal to the Merit Systems Protection Board, and judicial review in the Court of Appeals for the Federal Circuit."  *Tiltti v. Weise*, 155 F.3d 596, 596 (2d Cir. 1998) (internal quotes and citation omitted).

As explained by the Court in *Tiltti*:

The Reform Act does provide a method by which government employees may challenge such reassignment orders:  the employee may file a petition with the Office of Special Counsel.  5 U.S.C. §§ 1212(a)(2), 1214(a)(1)(A) (1994).  The Special Counsel must investigate "any allegation of a prohibited personnel practice ... to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken."  5 U.S.C. § 1214(a)(1)(A).  A "prohibited personnel practice" is defined to include "a detail, transfer, or reassignment" made for an impermissible purpose as specified in the Act. 5 U.S.C. § 2302(a)(2)(A)(iv), (b) (1994 & Supp. II 1997).  If the Special Counsel determines that there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is likely to take place, the Special Counsel may request the agency to take corrective action and, if

20

> that is not done, may petition the Board for such action.  5 U.S.C. §
> 1214(b)(2)(B), (C).
>
> If the Special Counsel terminates the investigation, the employee who initiated it
> is told the reason for such action. 5 U.S.C. § 1214(a)(2)(A).  "Judicial review of
> an [Office of Special Counsel] decision is limited, at most, to insuring compliance
> with the statutory requirement that the OSC perform an adequate inquiry on which
> to base its disposition of an employee's petition." *Cutts v. Fowler*, 692 F.2d 138,
> 140 (D.C.Cir.1982).

*Tiltti*, 155 F.3d at 601.  The CSRA replaced the preexisting "patchwork system with an

integrated scheme of administrative and judicial review, designed to balance the legitimate

interests of various categories of federal employees with the needs of sound and efficient

administration."  *United States v. Fausto*, 484 U.S. 439, 445 (1988).  "The basic principle

announced and applied in *Fausto* is that the Reform Act's comprehensive system for reviewing

personnel action taken against federal employees provides the exclusive remedy by which those

employees may challenge such actions and, unless the Reform Act either explicitly or by

necessary implication sanctions judicial challenges to such actions, judicial challenge is

foreclosed."  *Tiltti*, 155 F.3d at 600 (internal quotes and citation omitted).[2]

Thus, for claims falling within its purview, the CSRA provides the exclusive remedy.

*See Tiltti*, 155 F.3d at 600.  Federal courts lack jurisdiction over such claims until the CSRA's

remedial procedures have been exhausted.  *See Weaver v. United States Info. Agency*, 87 F.3d

1429, 1433 (D.C. Cir. 1996) ("Under the CSRA, exhaustion of administrative remedies is a

---

[2]  MSPB rules specifically provide that an employee "may request a stay of a personnel
action allegedly based on whistleblowing."  5 C.F.R. § 1209.8.  The MSPB's authorized
corrective actions include restoring the individual to his pre-misconduct position.  *See* 5 U.S.C.
§ 1214(g) (stating that MSPB's authorized corrective actions include, *inter alia*, "damages" and
orders "that the individual be placed, as nearly as possible, in the position the individual would
have been in had the prohibited personnel practice not occurred"); *Saul v. United States*, 928
F.2d 829, 843 (9th Cir. 1991) (noting that CSRA provides its own form of injunctive relief);
*Black v. Dep't of Justice*, 85 M.S.P.R. 650, 654 (M.S.P.B. 2000) (holding that MSPB has the
authority to order reinstatement).

21

jurisdictional prerequisite to suit."), *cert. denied*, 520 U.S. 1251 (1997).  This Court has no

jurisdiction to review a federal employment action, even in equity, where such action falls within

the CSRA's scope.  *See Dotson v. Griesa*, 398 F.3d 156, 180 (2d Cir. 2005)  ("[W]e today align

ourselves with those circuits that have held that employees covered by the CSRA-including

judicial branch employees-may not sue in equity for reinstatement of employment, even when

they present constitutional challenges to their termination.").  As explained by the Court in

*Dotson*:

> Congress's power to restrict the availability of equitable relief cannot be disputed.
> While courts proceed cautiously when considering whether Congress has
> impliedly imposed such a restriction on the authority to award injunctive relief to
> vindicate constitutional rights, we conclude that Congress's intent in fashioning
> the CSRA is clear:  federal employees may seek court review for employment
> actions as provided in the CSRA *or not at all.*
> * * * *
> The integration of equitable relief, including reinstatement, into the CSRA's
> comprehensive statutory scheme evinces Congress's intent to determine for itself
> the scope of that relief and to preclude its applicability to federal employment
> disputes except where provided by statute.

*Dotson*, 398 F.3d at 180 (emphasis in original) (internal citations and quotation omitted).

### 2.    The Allegations Underlying Plaintiff's Motion Give Rise to Claims Cognizable Under the CSRA

Walia's allegation that, "[a]s a result of Yagoda's testimony in this case[,] Yagoda has

been involuntarily transferred from DSAC/JFK office," Pl. Br. at 4, clearly gives rise to claims

cognizable under the CSRA's administrative remedial process.  The CSRA explicitly prohibits

taking, failing to take, or threatening to take or fail to take, a personnel action "because of"

various forms of "whistleblowing."  5 U.S.C. § 2302(b)(8)- (b)(9) (2000).  Specifically, Section

2302 of the CSRA prohibits management from taking a personnel action with respect to any

employee because of his or her disclosure of a violation of "any law, rule, or regulation, or . . . an

abuse of authority," 5 U.S.C. § 2302(b)(8)(A)(i) and (ii); or because of his or her "exercise of any

appeal, complaint, or grievance right granted by any law, rule, or regulation," 5 U.S.C. § 2302(b)(9)(A); or because of "testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A)," 5 U.S.C. § 2302(b)(9)(B), or because of "cooperating with or disclosing information to the Inspector General of an agency, or the Special Counsel, in accordance with applicable provisions of law; or refusing to obey an order that would require the individual to violate a law," 5 U.S.C. § 2302(b)(9)(C) and (D).  In addition, Walia's allegation that DHS improperly reassigned Yagoda falls within the CSRA's "catch-all" prohibition on personnel actions violating the CSRA's merit system principles.  *See* 5 U.S.C. § 2302(b)(11).  A "personnel action" is defined to include, *inter alia*, "a detail, transfer, or reassignment" and "any other significant change in duties, responsibilities, or working conditions."  5 U.S.C. § 2302(a)(2)(A)(iv) and (xi).

Yagoda clearly has remedies under the CSRA with respect to his reassignment, and the Court should refrain from interfering with those procedures in the context of Walia's case. Walia, assuming he has standing to challenge Yagoda's reassignment through the CSRA's remedial scheme, has not alleged or otherwise shown administrative exhaustion under the CSRA. Nor has Walia alleged that the Government is denying him access to the grievance procedure in the CSRA.  In addition, Walia has not alleged any circumstance bringing his claim for injunctive relief outside the scope of the CSRA, *e.g.*, that his claim involves a constitutional issue which is "totally unrelated to the CSRA procedures."  *See Martin v. U.S. Environment Protection Agency*, 271 F. Supp. 2d 38, 44 (D.D.C. 2002).[3]

Nor does the All Writs Act, 28 U.S.C. § 1651, which empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the

---

[3]  Indeed, there is no allegation that even Yagoda has availed himself of the grievance procedures in the CSRA in connection with his reassignment to AIRG, which he learned about as early as December 5, 2008.  *See* Dalessandro Decl. ¶ 13 and Ex. 3.

usages and principles of law," provide an independent source for jurisdiction to issue preliminary relief in connection with a claim that is otherwise barred for lack of jurisdiction.  As explained by the Supreme Court:

> The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling. Although that Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate.

*Pennsylvania Bureau of Correction v. U.S. Marshals*, 474 U.S. 34, 43 (1985).  Consequently, this Court lacks jurisdiction to grant the requested preliminary relief.

## II.

## PLAINTIFF HAS NOT MET HIS BURDEN OF
## PROOF ON HIS MOTION FOR PRELIMINARY RELIEF

### A.      Governing Legal Standard

The law in this Circuit is that a preliminary injunction may be granted only upon a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.  *See Firemen's Fund Insur. Co. v. Leslie & Elliot Co., Inc.*, 867 F.2d 150 (2d Cir. 1989) (per curiam) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) (per curiam); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985).  In order to satisfy the requirements for a preliminary injunction, the moving party must establish the likelihood that irreparable harm will be suffered before a decision on the merits can be rendered, and a mere possibility of irreparable harm is insufficient to warrant that relief.  *Borey v. National Union Fire Insur. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

24

A plaintiff must meet an even higher standard when requesting a "mandatory injunction," *i.e.*, or one which "alter[s] the status quo by commanding some positive act," as opposed to one which "seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assoc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).  An injunction going beyond the preservation of the status quo requires "'a more substantial showing of likelihood of success,'" *Tom Doherty,* 60 F.3d at 34 (quoting *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 437, 441 (2d Cir. 1977)), and should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief," *Tom Doherty,* 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).  "Moreover, a particularly stringent standard for irreparable injury applies in government personnel cases." *Brown v. New York City Health & Hospitals Corporation Emergency Medical Service*, No. 96-CV-0156 (Glasser, J.), 1996 WL 68558, at *2 (E.D.N.Y. Feb. 5, 1996) (citing *American Postal Workers Union v. United States Postal Service*, 766 F.2d 715, 721 (2d Cir. 1984), *cert. denied*, 475 U.S. 1046 (1986)); *see also Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

**B.     Plaintiff Has Not Shown That Extreme or Very Serious Damage Will Result in the Absence of Preliminary Relief**

In this case, Walia cannot meet the essential threshold requirement that extreme or very serious damage will result from a denial of preliminary relief.[4]  Walia speculates that "there is a significant threat of irreparable harm to Walia's ability to present his case including witness testimony free of fear, intimidation and retaliation" and that "potential witnesses could only draw

---

[4]  To the extent Walia claims injury to his ability to present his case, his reliance on any alleged irreparable harm to Yagoda, *see* Pl. Aff. at 13, is misplaced.  To the extent Walia's motion is premised on alleged irreparable harm to Yagoda, as opposed to Walia's ability to present his own case, Walia has not shown that he has standing to seek preliminary relief based on any alleged irreparable injury to Yagoda.  *See Lujan*, 504 U.S. at 561-62.

25

one conclusion and that is if you testified and government does not like what you have to say then you will be involuntarily transferred."  Pl. Br. at 16.   Walia claims that there is one potential witness who "told Walia that he (witness) does not wish to get involved and provide testimony because of what the DHS/ICE management did to Yagoda."  *Id.*  Walia also refers to the reassignment's "potential to deter other witnesses."  Pl. Br. at 16-17.

However, Walia has not identified any such "potential witnesses" nor submitted an affidavit of any person with firsthand knowledge of the alleged intimidation of such potential witnesses.  The unsubstantiated assertions in Walia's brief and affidavit, which are either hearsay or speculation, are insufficient to meet even the non-heightened burden of proof applicable to requests for non-mandatory preliminary relief.  *See Holt v. Continental Group, Inc.,* 708 F.2d 87, 90-91 (2d Cir. 1983), *cert. denied,* 465 U.S. 1030 (1984) (declining to presume irreparable injury simply from a risk of chilling); *accord Marxe v. Jackson*, 833 F.2d 1121, 1126 (3d Cir. 1987) (stating that "the possibility that intimidation may occur does not mean that it has occurred"); *see also Rao v. New York City Health & Hospitals Corp.*, No. 89 Civ. 2700 (PNL), 1991 WL 64455, at *2 (S.D.N.Y. Apr. 12, 1991) (even under non-heightened standard for preliminary relief, where plaintiff failed to submit "affidavit of testimony of any person with first hand knowledge" and his "affidavit is either hearsay of speculation," plaintiff's "strong averments do not offer an adequate foundation" to demonstrate irreparable injury).

Regardless, even assuming an employee had in fact indicated to Walia that he did not wish to testify, that does not mean that the employee ultimately will not testify truthfully when requested or directed to do so either at a deposition or at trial.  Indeed, as Walia has not even noticed the deposition of the employee in question, Walia's concern is speculative and premature at best.  *See Marxe*, 833 F.2d at 1126 ("The discovery provisions of the Federal Rules of Civil Procedure and interviews of potential witnesses normally provide a plaintiff with ample access to the available evidence.  We do not think it is asking too much to insist that a Title VII plaintiff in

a retaliation case pursue these avenues before concluding that they will be futile [and seeking preliminary relief].").  Walia has not even attempted to explain why any potentially intimidated witness's testimony is essential to his case such that its absence would cause extreme or very serious damage to his case.

Likewise, there is no allegation, much less a showing, that Yagoda himself is unwilling to testify truthfully on account of his reassignment, perhaps because such an allegation is belied by the record.  If anything, the record is overwhelmingly to the contrary.  There are numerous instances in which Yagoda, despite his allegation of retaliation on account of his whistle-blowing activities, has freely criticized the agency in various fora over the past year, including in this case during his deposition.  For example, before his reassignment to AIRG, Yagoda complained about DHS to the EEO in his own case and in the EEO cases of other employees, to the Office of the Inspector General, to the Office of Professional Responsibility, and repeatedly up the chain of command at DHS to the very individuals he claims retaliated against him.  *See* Pl. Aff. Ex. 1 at ¶¶ 2, 3, 5; *Id.* Ex. 2 at 14-16; *Id.* Ex. 4.  Yagoda became even more vocal against DHS *after* his reassignment, taking his complaints outside SAC NY to politicians, including Senators Charles Schumer and Hillary Clinton, Congressman Peter King, and Congresswoman Carolyn McCarthy, asking for a congressional inquiry into his complaints against DHS, and all those letters were copied to SAC NY management and Julie Myers, Assistant Secretary, DHS.  *See* Pantoja Decl. Ex. 3 (January 8, 2008 letters).

Finally, even assuming, *arguendo*, that an essential witness has been intimidated, Walia has made no showing that preliminary relief will cure whatever harm it is intended to address. Preliminary relief should not issue where it will not cure any irreparable harm.  *See Costello v. McEnery*, 767 F. Supp. 72, 77 (E.D.N.Y. 1991) (denying preliminary relief where "the interim injunctive relief plaintiff seeks in his instant motion will do nothing to thaw that chill") (citing

*Savage v. Gorski*, 850 F.2d 64, 67-68 (2d Cir. 1988); *American Postal Workers*, 766 F.2d at 722; *Rao*, 1991 WL 64455).

A related consideration is Walia's delay in seeking injunctive relief.  "The Second Circuit has observed that '[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action. . . . Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'"  *Costello*, 767 F. Supp. at 78 (citing *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir. 1985); *Borey v. National Union Fire Insurance Company of Pittsburgh*, 934 F.2d 30, 33-34 (2d Cir. 1991)); *see also Shady v. Tyson*, 5 F. Supp. 2d 102, 108-09 (E.D.N.Y. 1998) (denying preliminary relief not sought until one year after allegedly adverse action).  Walia's delay of several months in moving for preliminary relief, while perhaps not indicative of a lack of diligence because the parties were exchanging information during that time, certainly suggests a lack of urgency in connection with what is supposed to be an extraordinary remedy.  "This delay in seeking relief bolsters the . . . conclusion that there has been an insufficient showing of irreparable harm to justify issuance of a preliminary injunction."  *Costello*, 767 F. Supp. at 75.

In short, Walia has not met the irreparable harm standard applicable to mandatory injunctions and government personnel decisions, accordingly his motion for preliminary relief should be denied.

**C.    Plaintiff Cannot Make a Clear Showing of Entitlement to Preliminary Relief**

Alternatively, Walia has not established a likelihood of success on the merits of his claim that Yagoda's reassignment was made in retaliation for Yagoda's deposition testimony in this

case, a claim which comes within the scope of the CSRA.  *See* 5 U.S.C. 2302(b)(9).[5]  "[T]he requirement for substantial proof is much higher" on "a plaintiff's motion for preliminary injunctive relief" than it is on a defendant's motion for summary judgment.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Id.* (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed.1995)).

Walia has not articulated any legal standards under which he or Yagoda may prevail on the claim that Yagoda's transfer constituted a retaliatory personnel action within the meaning of the CSRA.  "Reprisal constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b)(9), for which the employee bears the burden of proof."  *Dunning v. N.A.S.A.*, 718 F.2d 1170, 1174 (D.C. Cir. 1983) (citing 5 U.S.C. § 7701(c)(2)(B)).  "[T]o establish a violation of § 2302(b)(9) an employee must show that (1) he engaged in protected activity;  (2) he was subsequently treated adversely by his employer;  (3) the deciding official had actual or constructive knowledge that the employee had engaged in the protected activity; and (4) there is a causal connection between the protected activity and the adverse action."  *Id.*

### 1. Yagoda's Reassignment Does Not Rise to the Level of an Adverse Action Under Applicable Law

Walia cannot prevail on his claim because Yagoda's reassignment from JFK to Manhattan was not an adverse action for purposes of the CSRA.  The record is clear that Yagoda remained a Grade 14 supervisory Special Agent after his reassignment, and there is no allegation

---

[5]  In his moving papers, Walia incorrectly focuses on the prospects for success on his own claims of retaliation and discrimination, as opposed to the prospects for success on the claim for which preliminary relief is sought – here, the challenge to Yagoda's reassignment as an improper personnel action under the CSRA.  *See* Pl. Br. at 17-31.  Accordingly, defendant will not address Walia's arguments concerning the merits of his own claims.

29

that his pay or grade was affected in any way.  There is no restriction on the reassignment of Special Agents based solely on the effect upon their commutes to work, and Special Agents are specifically required to acknowledge and accept the authority of the agency to reassign them to different locations with little or no notice from the agency.  *See* Monteagudo Decl. ¶¶ 5-6 and Ex. 2; Dalessandro Decl. ¶ 23; Ficke Decl. ¶ 14 and Ex. 1; Edge Decl. ¶¶ 5, 7, 14; Forman Decl. ¶¶ 3, 14.  Yagoda's conclusory statements that his reassignment to AIRG is detrimental to his career finds no support in the record.  *See* Pl. Aff. Ex. 1 at ¶¶ 16-17.  Dalessandro explained that AIRG provides a unique function that is essential to the impairment of criminal organizations and their money-laundering schemes.  Dalessandro Decl. ¶ 25.  Indeed, AIRG is located in Manhattan, along with the other more high-profile divisions of SAC NY.  *See* Dalessandro Decl. Ex. 1 (organization chart).

Yagoda's self-serving and conclusory statements aside, *see* Pl. Aff. Ex. 1 at ¶¶ 14-17, 21, Walia has made no showing that Yagoda's reassignment to AIRG had any adverse effect on his career prospects or otherwise constituted a material change in his stature as a Group Supervisor. Yagoda's subjective dissatisfaction with his assignment would be insufficient to establish an adverse employment action and survive summary judgment.  *See, e.g., Beyer v. County of Nassau*, 02-CV-3310 (DLI) (ARL), 2006 WL 2729196 (E.D.N.Y. Sept. 25, 2006) (in the Title VII context, "[p]laintiff's dashed hopes and bruised ego does not turn a denial of a transfer into an actionable adverse employment action, especially where, as here, there was no decrease in wage or salary or any loss of benefits").

Indeed, under the CSRA, "a reassignment of an employee to a new location at the same pay and grade . . . is not an adverse action."  *Tiltti*, 155 F.3d at 600-601 (citing *Manning v. Merit Sys. Protection Bd.*, 742 F.2d 1424, 1427 (Fed. Cir. 1984); *Thomas v. United States*, 709 F.2d 48,

50 (Fed. Cir. 1983)).[6]  In addition, "[t]he geographical assignment of individual employees is ordinarily within the discretion of the employing agency."  *Id.*  (citing *Urbina v. United States*, 209 Ct. Cl. 192, 530 F.2d 1387, 1390 (Fed. Cl. 1976)).  Consequently, Walia cannot establish a likelihood of success, much less the "clear showing" of entitlement to relief required for mandatory injunctive relief, if he were to pursue his claim under the CSRA.

### 2.    Plaintiff Has Not Shown That Dalessandro Had Actual or Constructive Knowledge of Yagoda's Deposition Testimony in this Case

Even assuming Yagoda's reassignment were an adverse action for purposes of the CSRA – which it is not – Walia does not identify any direct evidence of retaliatory animus or circumstantial evidence of disparate treatment in connection with Yagoda's reassignment, other

---

[6]  Cases from the Second Circuit and three other circuits indicate that the preclusive effect of the CSRA extends beyond the contours of its remedies, *i.e.*, bars judicial relief even where federal employee has no remedy under CSRA.  *See Dotson*, 398 F.3d at 166-77 (comprehensive remedial scheme established by the CSRA precluded former probation officer from challenging his termination through Bivens action for money damages, as well as from pursuing equitable relief in nature of reinstatement); *See Saul v. United States*, 928 F.2d 829, 840 (9th Cir. 1991) ("The CSRA's comprehensive remedial provisions convince us that there was no inadvertence by Congress in omitting a damages remedy against supervisors whose work-related actions allegedly violate a subordinate's constitutional rights.  In the area of federal employment, Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *Lombardi v. Small Business Admin.*, 889 F.2d 959, 961-62 (10th Cir. 1989) ("As to Appellant's assertion that injunctive relief is still available even after [*Schweiker v. Chilicky*, 487 U.S. 412 (1988)], we are of the opinion that the clear purpose of *Chilicky* and the related cases is to virtually prohibit intrusion by the Courts into the statutory scheme established by Congress.  This judicial intervention is disfavored whether it is accomplished by the creation of a damages remedy or injunctive relief."); *Volk v. Hobson*, 866 F.2d 1398, 1403-04 (Fed. Cir.) (CSRA remedies were "provided by Congress as a package.  Whether or not an employee has access to all of the procedures and remedies of the CSRA, or, as here, fails to fully avail herself of those she has, it illustrates the logic inherent in the Supreme Court's admonitions to leave the architecture of the federal personnel system to Congress."), *cert. denied*, 490 U.S. 1092 (1989).

than the mere timing of his reassignment on January 6, 2008, and a "rumor" that someone at the December 4, 2007 meeting proposed that Yogoda be reassigned to force him to retire.  *See* Pl. Br. at 8; Dalessandro Decl. Ex. 3 (Yagoda e-mail referring to "rumor" of his imminent reassignment).  Furthermore, there is no evidence that the decisionmaker – here Dalessandro – had knowledge, actual or constructive, of the fact that Yagoda had provided deposition testimony in this case, nor any evidence that anyone who is alleged to have harbored retaliatory animus toward Yagoda played any role in the decision to transfer Yagoda to AIRG.  *See* Dalessandro Decl. ¶ 32.

The statement in Yagoda's affidavit that, "at th[e] [December 4, 2007] meeting a manager that was present stated that I was going to be transferred from [JFK] to [NYC] in an effort to force me to retire," Pl. Aff. at ¶ 19 and Ex. 1 (Yagoda affidavit) at 11, is rank hearsay and insufficient proof of what happened at that meeting.  There is no allegation that Yagoda has personal knowledge of anything that transpired at that meeting.  By contrast, Dalessandro's sworn and uncontroverted testimony is that he had selected Yagoda and the other two supervisors for reassignments *prior to* the December 4th meeting, which essentially renders that meeting a non-event in connection with Yagoda's transfer.  Dalessandro Decl. ¶¶ 7-9.  The purpose of the December 4th meeting was to identify *non-supervisory* personnel for the upcoming realignment, and, in any event, the sworn and uncontroverted testimony of individuals who attended the meeting is that no one proposed that Yagoda be reassigned to force him to retire.  *See* Dalessandro Decl. ¶ 9; Edge Decl. ¶ 16; Forman Decl. ¶ 12.

The record overwhelmingly establishes that involuntary reassignments of Special Agents, including supervisory Special Agents, is a common occurrence, and that Yagoda is not the only supervisory Special Agent who has been moved between the JFK and Manhattan offices during the past five years.  *See* Dalessandro Decl. ¶¶ 6, 33-39 and Ex. 7; Ficke Decl. ¶¶ 3-14 and Ex. 1; Monteagudo Decl. ¶¶ 5-6 and Ex. 2.   Indeed, there have been numerous supervisory

32

reassignments in the past five years, including movement of supervisory Special Agents between the Manhattan and JFK offices.  For example, Edge and Forman were Grade 15 supervisory Special Agents holding high-level ASAC positions when they were reassigned between DSAC NYC and DSAC JFK just a year ago.  Dalessandro Decl. ¶¶ 38-39; Edge Decl. ¶¶ 5, 14; Forman Decl. ¶¶ 3, 14.  The reassignment of Heydweiller, a Grade 14 Group Supervisor like Yagoda, from RAC Long Island to Manhattan involved a greater change in her duty station than Yagoda's reassignment from JFK to Manhattan.  Ficke Decl. ¶ 8.

### 3.  Plaintiff Cannot Show a Causal Relationship Between Yagoda's Deposition Testimony in this Case and His Reassignment to AIRG

The mere timing of Yagoda's reassignment – approximately six months after his deposition testimony in this case – is, without more, insufficient to establish causation.  *See, e.g., Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (although not adopting a bright-line rule, noting, in the context of Title VII, that temporal proximity must be "very close" to support inference of causation).  In addition, retaliatory motive is belied by the record in this case.  The Government presented legitimate, non-retaliatory reasons for selecting Yagoda to fill the AIRG vacancy. Yagoda had more substantive experience in AIRG than any of the other supervisory Special Agents considered by Dalessandro, continued to express an interest in the type of work performed by AIRG even after he left that group at the end of 2002, and had spent five years as Group Supervisor of the General Investigations group, which like AIRG, has a an administrative component.  Dalessandro Decl. ¶¶ 18-20, 25-31.  In addition, Dalessandro did not select Kane and Houlihan because they were handling undercover operations at the time which required special expertise.  *Id.* ¶¶ 26, 29-30; Kane Decl. ¶ 6; Houlihan Decl. ¶ 9.

By contrast, Yagoda's General Investigations group, as suggested by the name, did not require any particular expertise, and Yagoda was not heading or otherwise participating in an undercover operation at the time he was selected for to fill the AIRG vacancy.  Dalesandro Decl.

33

¶ 30.  Likewise, Dalessandro reasonably concluded that Foresta and Imburgia were not as suitable for the AIRG position as Yagoda because he had more experience in the type of work performed by AIRG than either of them.  Dalessandro Decl. ¶¶ 27-28, 31.  Looking at just the undisputed facts – Yagoda was not involved in an undercover operation at the time he was selected; had more years of experience in AIRG than Kane, Houlihan, Foresta, and Imburgia; and was the only one who expressed continued interest in the type work performed by AIRG after he left that group – there is ample justification for Dalessandro's selection of Yagoda to fill the AIRG vacancy.

Finally, to the extent Walia is alleging that the January 2008 reassignment is suspicious because of DHS's prior efforts to reassign Yagoda involuntarily in March and September 2007, *see* Pl. Br. at 6-7, 13, that allegation is without merit.  The record shows that during the last five years, Yagoda was reassigned only once, *i.e.*, when he was reassigned to AIRG effective January 6, 2008.  *See* Monteagudo Decl. ¶ 3.  Specifically, there is no record of a personnel action, a request for personnel action, or any other document reflecting or requesting a change in the position held by Yagoda during 2007.  *Id.*; Edge Decl. ¶ 12.  Walia's reliance on a Form SF-52 with an effective date of September 30, 2007, is misplaced.  Walia conclusorily and incorrectly describes that document as evidencing an involuntary reassignment of Yagoda.  *See* Pl. Br. at 6-7; Walia Aff. Ex. 3.  In fact, that document merely memorializes that SAC NY was reorganized, as indicated in blocks 5B and 5D of the form, and that the effect of the reorganization, as reflected in block 22, was that the entire SAC NY now reported to an Assistant Director of Operations for the East Coast.  *See* Monteagudo Decl. ¶ 4.  The form does not reflect any change in Yagoda's title, grade, pay, duties, or duty station.  *Id.*

Accordingly, Walia cannot make a clear showing that he is entitled to the preliminary relief he seeks, and his motion for a preliminary injunction should be denied.

34

## III.

## PLAINTIFF'S APPLICATION FOR A PROTECTIVE ORDER SHOULD BE DENIED

Walia's request for a "protective order enjoining the defendant from engaging in intimidation and retaliation against witnesses and potential witnesses in this case," Pl. Br. at 5, is in substance another request for preliminary relief.  As such, it fails for the same reasons compelling denial of Walia's request for an order requiring DHS to return Yagoda to his former position.  *See* Sections I and II, *supra*.   In any event, Walia's vague and open-ended request for a "protective order" cannot form the basis for injunctive relief.  "[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."  *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996).  Accordingly, Walia's request for a protective order should be denied.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should deny plaintiff's application for a protective order and a preliminary injunction.

Dated: April 4, 2008
         New York, New York

                                        Respectfully submitted,

                                        MICHAEL B. MUKASEY
                                        United States Attorney General
                                        Attorney for Defendant

                               By:    ___/s/ Joseph A. Pantoja_____
                                        JOSEPH A. PANTOJA
                                        Special Attorney to the Attorney General
                                        United States Attorney's Office
                                        Southern District of New York
                                        86 Chambers Street -- 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2785

## CERTIFICATE OF SERVICE

I, Joseph A. Pantoja, Special Attorney to the Attorney General, hereby certify that on April 4, 2008, I caused a copy of the following documents to be served, by Federal Express upon plaintiff's counsel at the address below indicated:  (1) Memorandum of Law in Opposition to Plaintiff's Motion For a Preliminary Injunction and a Protective Order; (2) the Declaration  of Salvatore Dalessandro; (3) the Declaration of Martin D. Ficke; (4) the Declaration of Peter T. Edge; (5) the Declaration of Mona Forman; (6) the Declaration of Douglas Hooper; (7) the Declaration of Edith A. Monteugudo; (8) the Declaration of Drew F. Houlihan; (9) the Declaration of John Kane; and (10) the Declaration of Joseph A. Pantoja.

> Louis D. Stober, Jr., Esq.
> Law Offices of Louis D. Stober, Jr., LLC
> 350 Old Country Road, Suite 205
> Garden City, NY 11530

Dated: April 7, 2008
      New York, New York

         /s/ Joseph A. Pantoja
        JOSEPH A. PANTOJA
        Special Attorney to the Attorney General